IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| FILIBERTO ROBLES ALVARADO, JOEL CASTILLO, JAVIER CHAVEZ-CIPRIANO, JESUS CHAVEZ-CIPRIANO, FELICIANO CURIEL GIL, OSCAR ESPINOZA, GERARDO GUZMAN, ELEAZAR HERNANDEZ GIL, DAVID MALDONADO, JOSE ANGEL MALDONADO, MIGUEL ANGEL PAZ PEDRO PAZ ESTRADA, ISAAC PENA RAMIREZ, WINGER RAMOS and JOEL SIXTOS SALVADOR | § § § § § § § § § § § § § § | |
| Plaintiffs, | § § | CIVIL ACTION NO. H-06-CV-02113 |
| V. | § § | JURY TRIAL |
| SHIPLEY DONUT FLOUR & SUPPLY CO., INC. d/b/a SHIPLEY DO-NUTS | § § § § | |
| Defendant. | § | |

## DEFENDANT'S MOTION TO EXCLUDE
## EXPERT TESTIMONY OF DR. SHARI JULIAN

Respectfully submitted,

OF COUNSEL:

Tony Rosenstein
State Bar No. 17279400
Fed. I.D. No. 01877

BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana
Houston, Texas  77002
Telephone:  (713) 229-1234
Facsimile:  (713) 229-1522

BAKER BOTTS L.L.P.

Teresa S. Valderrama
State Bar No. 20422500
Federal I.D. No. 10687
One Shell Plaza
910 Louisiana
Houston, Texas  77002
Telephone:  (713) 229-1860
Facsimile:  (713) 229-1522

COUNSEL FOR SHIPLEY DONUT FLOUR &
SUPPLY CO., INC.

## TABLE OF CONTENTS

Table of Exhibits.................................................................................................................. ii

Table of Authorities ............................................................................................................ iii

I.    Introduction and Summary of Argument.......................................................... 1

II.   Factual Background ......................................................................................... 3

III.  Argument and Authorities............................................................................... 5

      A.   Standards Governing the Admissibility of Expert Testimony................................. 5

      B.   Application Of Specific *Daubert* Factors ............................................................. 6

           1.   "Whether the Theory or Technique . . . Can Be (And Has Been)
                Tested." .......................................................................................... 6

           2.   "General Acceptance Within the Scientific Community." ........................ 7

           3.   "Whether There Is a High Known or Potential Rate of Error"................... 8

           4.   "Whether There are Standards Controlling the Technique's
                Operation"....................................................................................... 9

      C.   Dr. Julian's Diagnosis of Post-Traumatic Stress Disorder Is Inconsistent
           With Generally Accepted Diagnostic Criteria ..................................................... 10

      D.   Dr. Julian's Diagnosis of Post-Traumatic Stress Disorder Is Generally
           Unreliable........................................................................................................... 14

      E.   Dr. Julian's Human Resource Opinions Should Be Excluded.............................. 16

      F.   Dr. Julian's Testimony Should Be Excluded Because The Prejudicial
           Effect of the Testimony Outweighs Any Probative Value ................................... 18

IV.   Conclusion ...................................................................................................... 19

## TABLE OF EXHIBITS

The following Exhibits are cited in this Motion:

1.    Exhibit A    Report of Randall Price, Ph.D.

2.    Exhibit B    Deposition of Shari Julian, Ph.D[1]

3.    Exhibit C    First Report of Shari Julian, Ph.D. dated 02/28/07
                   (also Docket #46 and Julian Depo. Ex. 4)

4.    Exhibit D    Second Report of Shari Julian, Ph.D. dated 6/18/07
                   (also Docket #60 and Julian Depo. 2)

5.    Exhibit E    Letter dated 02/26/07 from Rhonda H. Wills to Dr. Shari Julian
                   (also Julian Depo. Ex. 6)

6.    Exhibit F    Shari Julian interview notes
                   (also Julian Depo. Ex. 5)

7.    Exhibit G    *The Aleutian Enterprise* Sinking and Post-Traumatic Stress Disorder:
                   Misdiagnosis in Clinical and Forensic Settings (American Psychological
                   Association, 1995, Official Psychology:  Research and Practice, Vol. 26,
                   No. 1)

8.    Exhibit H    DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL
                   DISORDERS,  American Psychiatric Ass'n, (4th ed. 2000) ("DSM-IV"):
                   §309.81 (Post-Traumatic Stress Disorder)
                   (also Julian Depo. Ex. 7)

---

[1] Dr. Julian's complete deposition (Julian Depo.) is attached as Exhibit B.  For clarity of reference, Julian Deposition
Exhibits 2, 4, 5, 6, and 7 are separately attached and referenced as described herein.

# TABLE OF AUTHORITIES

## CASES

*Bocanegra v. Vicmar Servs., Inc.,*
   320 F.3d 581 (5th Cir. 2003) .............................................................................6

*Bodenheimer v. PPG Indus., Inc.,*
   5 F.3d 955 (5th Cir. 1993) ...............................................................................16

*Boyd v. State Farm Ins. Co.,*
   158 F.3d 326 (5th Cir. 1998) ...........................................................................16

*Bryant v. Compass Group USA Inc.,*
   413 F.3d 471 (5th Cir. 2005) ...........................................................................16

*Castellow v. Chevron USA,*
   97 F. Supp. 2d 780 (S.D. Tex. 2000) .................................................................6

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
   509 U.S. 579 (1993) ..........................................................................1, 2, 5, 6, 8,
   .................................................................................................10, 14, 15, 16, 18

*Edmonds v. Illinois Central Gulf R. Co.,*
   910 F.2d 1284 (5th Cir. 1990) .........................................................................19

*Kumho Tire Co. v. Carmichael,*
   526 U.S. 137 (1999)......................................................................................3, 5, 7

*Moore v. Ashland Chem. Inc.,*
   151 F.3d 269 (5th Cir. 1998) .............................................................................5

*Shepherd v. American Broadcasting Companies, Inc.,*
   862 F. Supp 486 (D.D.C. 1994), vacated on other grounds,
   62 F.3d. 1469 (D.C. Cir. 1995) ........................................................................14

*Smith v. Monsanto Chem. Co.,*
   770 F.2d 719 (8th Cir. 1985) ...........................................................................17

*Tyger Const. Co. v. Pensacola Const. Co.,*
   29 F.3d 137 (4th Cir. 1994) .............................................................................19

*Viterbo v. Dow Chem. Co.,*
   826 F.2d 420 (5th Cir. 1987) ...........................................................................19

*Watkins v. Telsmith, Inc.*,
121 F.3d 984 (5th Cir. 1997) ........................................................................................7, 16

## STATUTES

Fed. R. Evid. 403 ..............................................................................................................18

Fed. R. Evid. 702 ...........................................................................................5, 14, 16, 17, 18

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| FILIBERTO ROBLES ALVARADO, | § | |
| JOEL CASTILLO, JAVIER CHAVEZ- | § | |
| CIPRIANO, JESUS CHAVEZ-CIPRIANO, | § | |
| FELICIANO CURIEL GIL, OSCAR | § | |
| ESPINOZA, GERARDO GUZMAN, | § | |
| ELEAZAR HERNANDEZ GIL, DAVID | § | |
| MALDONADO, JOSE ANGEL | § | |
| MALDONADO, MIGUEL ANGEL PAZ | § | CIVIL ACTION NO. H-06-CV-02113 |
| PEDRO PAZ ESTRADA, ISAAC PENA | § | |
| RAMIREZ, WINGER RAMOS and | § | JURY TRIAL |
| JOEL SIXTOS SALVADOR | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| V. | § | |
| | § | |
| SHIPLEY DONUT FLOUR & SUPPLY | § | |
| CO., INC. d/b/a SHIPLEY DO-NUTS | § | |
| | § | |
| Defendant. | § | |

**DEFENDANT'S MOTION TO EXCLUDE**
**EXPERT TESTIMONY OF DR. SHARI JULIAN**

Defendant Shipley Donut Flour & Supply Co., Inc. ("Defendant Shipley") moves

to exclude the testimony of Plaintiffs' expert Dr. Shari Julian ("Dr. Julian") on the grounds that

her opinions are unreliable under *Daubert* and its progeny. In support of this Motion to Exclude,

Defendant Shipley would respectfully show the Court the following:

## I. INTRODUCTION AND SUMMARY OF ARGUMENT

This is a national origin discrimination case in which twelve Plaintiffs asserting

Mexican heritage allege they were mistreated primarily by their supervisor, also of Mexican

heritage.[1]  Plaintiffs complain that this supervisor, Jimmy Rivera, required bribes or kickbacks in

---

[1] *See* Defendant's Motion for Partial Summary Judgment ("MSJ") (Dkt. No. 78, filed 7/31/07) for a detailed summary of the facts and circumstances of this case.

1

return for employment perquisites, engaged in verbal abuse, and was allegedly able to get away with these behaviors because he was both in a trusted position with the Shipley family and, unlike Plaintiffs, was bilingual (and thus in control of the channels of communication between Plaintiffs and their employer).

Plaintiffs have designated Shari Julian, Ph.D. as an expert to testify about their alleged psychological injuries. Defendant Shipley will demonstrate in this motion that Dr. Julian's proffered testimony should be stricken under the principles established by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Specifically, Dr. Julian purports to "diagnose" all twelve Plaintiffs with post-traumatic stress disorder ("PTSD"), which would be amazingly improbable under any circumstances. (*See* § III.B(3), III.C, *infra*). In addition, the methodology employed by Dr. Julian was grossly inadequate and unreliable. For example, Dr. Julian settled upon her diagnosis that all of the Plaintiffs suffered from PTSD after spending perhaps a minute or two on the phone with each of them. And this was in the context of a conference call during which the brief exchanges with Plaintiffs had to be translated, because Dr. Julian is not bilingual. (*See* § II, *infra*.) To diagnose any mental disorder from such an interaction is not scientifically supportable. (*See* § III.D, *infra*.) Further, Dr. Julian did not use any psychological tests, such as the MMPI, that are available to assist in diagnosis of conditions such as PTSD (*see* § III.B(1), *infra*), and she did not do even a rudimentary case history on any of the Plaintiffs, which is a *sine quo non* of any competent psychological assessment. (*See* § III.B(2); III.B(4), *infra*.)

When asked why she did not take a psychological or life-experience history from any of the Plaintiffs or employ any psychometric instruments, Dr. Julian responded that, although such steps might be appropriate in a clinical setting, they were not necessary to render a

diagnosis in a judicial setting.  (*See* § III.B(2), *infra*.)  This is the antithesis of the Supreme Court's teaching:

> The [objective] of *Daubert's* gatekeeping requirement . . . is to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.[2]

## II.  FACTUAL BACKGROUND

Dr. Julian was retained by Plaintiffs' former counsel in February 2007.  She was then provided with a hyperbolic, argumentative and emotional summary of Plaintiffs' claims by their former co-counsel, Rhonda Wills (Ex. E, 2/26/07 Wills Letter to Dr. Julian.)  Shortly thereafter, Dr. Julian participated in a one-hour telephone interview with the then-15 Plaintiffs.  (Ex. B, Julian Depo. at 44.)  She did not retain any interview notes of this conference.  (*Id.* at 46).

This one-hour telephonic interview was apparently moderated by Plaintiffs' counsel.  Dr. Julian was in her office at Fort Worth while Plaintiffs and their counsel were on one or more speaker phones in Houston.  (*Id.* at 44.)  In addition, since the Plaintiffs speak Spanish and Dr. Julian is not bilingual (Ex. B, Julian Depo. at 33, 45), a translator was also present with Plaintiffs and their counsel.  It was necessary, of course, for the translator to first translate Dr. Julian's questions into Spanish and then translate Plaintiffs' responses into English so that Dr. Julian could understand them (*id.* at 44-45).  Dr. Julian admitted that this laborious process resulted in her effectively having, at the most, a two-minute interview per Plaintiff.  (*Id.* at 50-51.)

---

[2] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

Within a few days of the above-described conference call, Dr. Julian produced a report which essentially parroted the allegations as set forth by Plaintiffs' former counsel.[3] Based upon these allegations and the brief (almost momentary) interviews with Plaintiffs that were part of the conference call, Dr. Julian concluded that it could be "safely assumed" that all of the Plaintiffs were suffering from post-traumatic stress disorder.  (Ex. C, Julian 2/28/07 Report, at 4).

Nearly three months later, Dr. Julian came to Houston and visited with the Plaintiffs in person.  During these interviews Dr. Julian did not administer any psychometric tests or other diagnostic instruments (Ex. B, Julian Depo. at 60-61.)  Dr. Julian claims to have conducted a "structured interview" with each Plaintiff, but she admits that she did not use any of the available structured interview protocols which are commonly employed as part of the assessment of PTSD (*Id.* at 29-30, 36-37, 39.)  Further, Dr. Julian admits that she did not record the questions and answers for the so-called structured interviews, but rather wrote two- or three-sentence summaries of the entire interview with each Plaintiff.  (*Id.* at 41, 56-58; Ex. F (Julian Interview Notes).)  Finally in this regard, Dr. Julian admits that she did not take any clinical or life history of any of the Plaintiffs which would normally be a part of any clinical mental status examination (*Id.* at 62-63.)

Based upon the above-described assessment methodology, Dr. Julian "confirmed" the diagnosis that she had previously "safely-assumed."  That is, she diagnosed each and every of the remaining twelve Plaintiffs with PTSD.  (Ex. B, Julian Depo. at 29: 17-20.)

---

[3] *Compare* (Ex. C, Julian report of 2/28/07) *with* (Ex. E, Wills 02/26/07 Letter to Dr. Julian); *See also* Ex. B, Julian depo at 68: 25 - 69: 7.

### III.  ARGUMENT AND AUTHORITIES

**A.    Standards Governing the Admissibility of Expert Testimony**

Federal Rule of Evidence 702, which governs the admissibility of expert testimony, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702.

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), sets forth the analytical framework for determining whether expert testimony is admissible under Rule 702.  Under *Daubert*, trial courts are charged with the obligation to screen expert testimony to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589.  The purpose of this "gate-keeping" obligation is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.,* 526 U.S. at 152.

Under *Daubert*, the party seeking to admit the expert testimony has the burden to "prove by a preponderance of the evidence that the testimony is reliable." *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc).  In evaluating reliability, a district court may consider: "(1) whether the expert's theory can be or has been tested, (2) whether the theory has been subjected to peer review and publication, (3) the known or potential rate of error of a technique or theory when applied, (4) the existence and maintenance of standards and controls,

and (5) the degree to which the technique or theory has been generally accepted in the scientific community." *Daubert*, 509 U.S. at 593-94; *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 585 (5th Cir. 2003). These factors, however, "do not constitute a definitive checklist, but comprise a non-exclusive, flexible test to ascertain the validity or reliability of the methodology that the expert employed." *Castellow v. Chevron USA*, 97 F. Supp. 2d 780, 784 (S.D. Tex. 2000).

**B.     Application Of Specific *Daubert* Factors**

An examination of Dr. Julian's methodology through the prism of the Supreme Court's suggested factors for assessing the reliability of scientific evidence leads inexorably to the conclusion that the proffered testimony must be excluded. Consider the following:

**1.     "Whether the Theory or Technique . . . Can Be (And Has Been) Tested."**

Dr. Julian's diagnostic assessment is remarkable for its lack of controls. Her conclusions rest solely upon highly subjective perceptions, colored by a stated predisposition to find PTSD. As such, there is no real way to test Dr. Julian's conclusions, which is contrary to the scientific method. *See Daubert*, 509 U.S. at 593 ("The criterion of the scientific status of a theory is its . . . testability.") (citation omitted).

It did not have to be this way. As pointed out by Defendant Shipley's expert in clinical psychology, a competent and routine assessment for PTSD would have included psychometric testing which would potentially have furnished a basis for confirming or refuting the diagnoses. (Ex. A, Expert Report of Randall Price, Ph.D. ("Price's Report") at 5 ¶5 (Dkt. No. 67).) Furthermore, had Dr. Julian used a true structured interview instrument, there would have been checks and balances in comparing Plaintiffs' responses to those either typical or atypical of persons known to be suffering from PTSD. (Ex. A, Price Report at 5-6, ¶¶ 2-3.) Had Dr. Julian even written down the questions that she used (which she did not) or recorded the responses to those questions (which she did not), an objective examiner would have at least been

able to ascertain whether the questions were appropriate and non-leading.[4]  (Ex. A, Price Report at ¶ 3.)  Finally, the total failure to take any clinical or psychological history of any of the twelve Plaintiffs is not only a departure from competent psychological practice (as discussed more fully below), but it, too, results in no meaningful trail of reasoning from data to conclusions.  (Ex. A, Price Report at 6, ¶ 3.)

## 2.     "General Acceptance Within the Scientific Community."

Dr. Julian's approach is contrary to accepted scientific practice.  First, as pointed out by Dr. Price, it is essential to a reliable psychological diagnosis to take a complete case or life history.  (Ex. A, Price Report at 5-7.)  Dr. Julian admitted that she took no case histories at all (Ex. B, Julian Depo. at 63.)  Asked why she did not do this, Dr. Julian testified that while the taking of a detailed case or family history is important for clinical work, it is not necessary in a forensic setting.  (Ex. B, Julian Depo. at 62-64.)  Dr. Julian articulated a similar rationale for not using any psychometric testing, even though she acknowledged that there are specific tests available for the assessment of PTSD.  (*Id.* at 60-62.)[5]  This is directly contrary to the Supreme Court's teaching that it is essential that a testifying expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in a relevant field." *Kumho Tire Co.*, 526 U.S. at 152.  As Dr. Price notes:

> However, I disagree that the differences between [forensic and clinical assessment] dictate that the forensic evaluator do a less thorough job than the treating doctor.  I disagree that the forensic mental health evaluator omit important methodological components of an evaluation such as the administration of psychological testing and the taking of a comprehensive life history of the plaintiff.  These methods are as critical for a generally accepted and reliable forensic evaluation as they are for a

---

[4] *See Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988, 992 (5th Cir. 1997) (affirming district court's exclusion of expert and relying in part on expert's failure to preserve and retain calculations and sketches underlying his analysis).

[5] This is not accepted practice within the scientific community.  (*See* Ex. A Price Report at 3, 5, 8.)

> treatment-oriented clinical evaluation. In a case such as this one,
> the forensic evaluator is conducting a clinical evaluation for the
> court that is tailored to address the relevant psychological issues.
> Forensic evaluations do not omit important clinical methods just
> because they are clinical.[6]

Another telling aspect of Dr. Julian's approach is her reasoning toward a predetermined result, as opposed to an open-minded search for the correct result which is a hallmark of the scientific method. *See Daubert*, 509 U.S. at 590 (". . . to qualify as scientific knowledge, an inference or causation must be derived by the scientific method.") It is obviously unsupportable — if not bizarre — to purport to diagnose PTSD or any other psychological disorder based upon one or two minutes of telephone conversation with the subject through a translator. Yet, that is exactly what happened here.

Dr. Price has described this as "confirmation bias," which seems particularly apropos. (Ex. A, Price Report at 7-8.) Dr. Julian did not employ any of the standard and available diagnostic tools (case history, psychometrics, standardized structured interview, etc.) because she was interested only in confirming her subjective view, not in testing the accuracy of a mental status evaluation. In effect, Dr. Julian was delivering a helpful — albeit extraordinarily unlikely — diagnosis in response to a request from counsel. (*See* Ex. E, Wills 2/26/07 Letter to Dr. Julian.) This is not reliable scientific evidence as contemplated by *Daubert* and Federal Rule of Evidence 702.

### 3.    "Whether There Is a High Known or Potential Rate of Error"

Of course, any mental status assessment is subject to error because one is not dealing with phenomena subject to precise measurement. Indeed, Dr. Price cites an article (itself

---

[6] Ex. A, Price Report at 6-7 (emphasis in the original).

containing multiple sources) discussing the particular propensity for misdiagnosis of PTSD.[7] This is one reason that a disciplined application of controls and standards is particularly important in this area.

Thus, in the Supreme Court's parlance, there is a substantial probability of error in Dr. Julian's methodology, the precise rate of error is not "known," and the "potential" rate of error is quite high.   This point is underscored by Dr. Price's discussion demonstrating the exceedingly low possibility that Dr. Julian's diagnosis could be objectively correct.   (Ex. A, Price Report at 8.)  Dr. Price points out that the probability of any given individual developing PTSD after a highly traumatic event varies from approximately nine to twenty percent.   (Id.) The probability, then, of a population of twelve persons all developing PTSD after such an event is infinitesimal (considerably less than one in a million).   (Id.)   And this assumes a trauma sufficiently extreme to cause PTSD.[8]  Given the lack of severe trauma in this case, these already infinitesimal probabilities would actually be overestimates for Dr. Julian's conclusions.

### 4.      "Whether There are Standards Controlling the Technique's Operation"

As demonstrated above, there are standards controlling the assessment of PTSD. Dr. Julian employed none of these.  In his report, Dr. Price states:

> The generally accepted method for the evaluation of PTSD is one
> that includes scientifically based psychological tests that include
> psychometric data or error rates.

---

[7] See Ex. A Price Report at p. 9, n. 5 (citing *The Aleutian Enterprise* Sinking and Post-Traumatic Stress Disorder: Misdiagnosis in Clinical and Forensic Settings (American Psychological Association, 1995, Official Psychology: Research and Practice, Vol. 26, No. 1).)  This article is attached as Exhibit G hereto.

[8] Dr. Julian admitted that, consistent with the American Psychological Association's diagnostic and statistical manual (the DSM-IV-TR), PTSD is not possible unless there is a severe trauma of life threatening proportion.  (The DSM uses examples such as kidnapping, combat, or torture.)   In this case there is nothing approaching that prerequisite, which also renders Dr. Julian's conclusions particularly questionable as discussed in Section III. C, *infra.*

(Ex. A, Price Report at 5 ¶ 1.)  Dr. Price goes on to note that "[Dr. Terrence] Keane recommends the use of multiple sources in the assessment of PTSD in litigation contexts, including taking a comprehensive history, a structured clinical interview, the use of general personality tests, the administration of specific tests that measure PTSD and its associated clinical features."  (*Id.*) Again, Dr. Julian employed none of these modalities or controls, despite her testimony that Dr. Keane is an authoritative expert on PTSD.[9]  (Ex. B, Julian Depo. at 145.)  Dr. Julian's methodology and opinions do not withstand analysis under any of the *Daubert* factors, and it is abundantly clear that the overarching requirement of that case is also not fulfilled; that is, that the expert employ the same intellectual rigor in offering forensic opinions as would be applied as scientists in the field generally.

### C.   Dr. Julian's Diagnosis of Post-Traumatic Stress Disorder Is Inconsistent With Generally Accepted Diagnostic Criteria

In addition to the methodological and scientific gaps described above, Dr. Julian's global PTSD diagnosis appears highly questionable as a threshold matter, because the two essential features of the condition — persistent avoidance behavior and degree of trauma — are lacking.  As to avoidance behavior, Dr. Julian testified as follows:

> Q:    It also must be characterized — that is, the PTSD should be characterized — by a persistent avoidance of the stimuli associated with the trauma, correct?
>
> A:    That's correct.[10]

---

[9] For example, Dr. Price suggests, among other things, that the MMPI-2 (and particularly the Keane PK Scale) could have been used to corroborate PTSD symptoms. (Ex. A, Price Report at 5.)  Dr. Julian agreed that she could have used the MMPI, a psychometric instrument that is available in Spanish and is frequently relied upon by practitioners in her field. (Ex. B, Julian Depo. at 60-61.)

[10] (Ex. B, Julian Dep. at 72.)  This is consistent with the DSM-IV description of PTSD (*e.g.*, "stimuli associated with the trauma are persistently avoided.  The person commonly makes deliberate efforts . . . to avoid activities, situations, or people who arouse recollections of it."  (Ex. H, DSM-IV at 464 (describing "309.81 post-traumatic stress disorder").)

Therefore, one would expect that the Plaintiffs would do everything in their power to avoid the alleged trauma: specifically, Jimmy Rivera and generally the Shipley workplace. Yet, the Plaintiffs continued to work at Shipley, and many of the Plaintiffs referred friends and loved ones to the same supposedly traumatically hostile environment. (Defendant's Mot. Summ. Judg. at 12.)

Dr. Julian's response to these phenomena was remarkable. First, she blinded herself as a scientist to them. For example, Dr. Julian did not even seek to find out which Plaintiffs were still employed and why they chose to stay, nor why they referred friends and relatives to Shipley. (Ex. B, Julian Dep. at 123-24.) To simply ignore these objective and important facts cannot be good science. As Dr. Price noted (somewhat generously), "Dr. Julian's analysis appears idiosyncratic, for example, . . . in her dismissal of the lack of avoidance behavior (Julian Deposition. p. 126, l. 4)." (Ex. A, Price Report at 7.) Further, when confronted with this issue, Dr. Julian came up with a pop psychology rationale (the "Stockholm Syndrome" — Ex. B, Julian Depo. at 124) not to be found in the DSM-IV and, as noted by Dr. Price, another example of an "idiosyncratic" method of analysis.

The *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition*, ("DSM-IV-TR") which is published by the American Psychiatric Association, sets forth the standard for the classification of psychiatric disorders in the United States and provides the recognized diagnostic criteria for PTSD. Pursuant to the DSM-IV-TR, a patient may only be diagnosed with PTSD if the symptoms are preceded by an "extreme traumatic stressor," which is defined as a "traumatic event in which both of the following were present:

      (1)      the person experienced, witnessed, or was confronted with an event or events that involved *actual or threatened death* or *serious injury*, or a *threat to the physical integrity* of self or others; and

11

(2)     the person's response involved intense fear, helplessness, or horror.

(*See* Ex. H, AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 467-68 (4th ed. 2000) (emphasis added).)

The DSM-IV-TR makes clear that "[i]n Post-Traumatic Stress Disorder, the stressor must be of an extreme (i.e., life-threatening) nature." (*Id.* at 467.) For this reason, the DSM-IV-TR's list of documented "stressors" giving rise to PTSD only involves incidents of actual or threatened physical trauma such as "military combat, violent personal assault (sexual assault, physical attack, robbery, mugging), being kidnapped, being taken hostage, terrorist attack, torture, incarceration as a prisoner of war or in a concentration camp, natural or manmade disasters, severe automobile accidents, or being diagnosed with a life-threatening illness." (*Id.* at 463-64.) Accordingly, in "situations in which the symptom pattern of Post-Traumatic Stress Disorder occurs in response to a stressor that is not extreme (e.g., spouse leaving, being fired)," a diagnosis of PTSD is inappropriate. (*Id.* at 467.)

Dr. Julian affirmed the extremely high threshold criterion for the trauma required as a predicate for a potential diagnosis of PTSD:

> Q:     . . . so that those of us who are not experts in your field understand this, when we talk about the kind of stressor for post-traumatic disorder, we are talking about, you know, what laymen might call an extremely traumatic event?
>
> A:     Correct.
>
> Q:     . . . and [DMS-IV] give some examples here on the same page:  being kidnapped or being taken hostage, tortured, put in a concentration camp, events of that type.
>
> Ms. Patrick:  Objection, form.
>
> Q:     Correct?
>
> A:     Those are some examples.

Q:     Right.  And from those examples, you — you get a flavor of the seriousness of the trauma that's required, correct?

A:     . . . [T]he true marker of PTSD is that it was an event so terrifying, so threatening, that it made one fear for one's life or one's personal safety.

(Ex. B, Julian Depo. at 72-73.)

. . .

Q:     You would agree that a spouse leaving is a significant stressor?

A:     It's a significant stressor.

Q:     But it is not sufficient, in and of itself, to qualify someone for a PTSD diagnosis?

A:     Right . . .

Q:     Do you consider being fired a traumatic event, being fired from your job?

A:     In most cases, yes. . . .

Q:     And in most cases — let's take the cases where it is a traumatic event.  What the authors [of DMS-IV] are saying is, that is not — that's an example of something that is not sufficiently severe, because it doesn't put one in the kind of terror and fear that is required for PTSD, correct?

A:     Yes, everything is circumstances . . .

(*Id.* at 75-77.)

While there is considerable dispute as to precisely how the events at issue in this case should be characterized (as demonstrated in the summary judgment briefing on both sides), there is no question that we are not dealing here with trauma on a par with "being kidnapped, terrorist attack, torture, incarceration as a prisoner of war or in a concentration camp," etc. Although the alleged conduct by plaintiffs' former supervisor (Jimmy Rivera) would be totally

unacceptable, whether it be the demanding and taking of bribes, or verbal or other abuse, it is simply not in the universe described in the DSM-IV.[11]

Moreover, the Plaintiffs' situation differs in another respect from the examples of trauma that define PTSD: the ability to escape the traumatic situation. Unlike the circumstances described in DSM-IV, such as kidnapping, torture, rape or combat, these Plaintiffs had the option — and just as importantly knew that they had the option — of leaving at any time. Surely this must affect the perceived nature of the trauma, and thus, no matter how offensive, boorish, childish or even abusive Rivera's alleged hazing behavior and kickbacks may have been, it would seem not to be the stuff of PTSD. This is an additional and alternative aspect which reinforces the extreme methodological and scientific indicia of unreliability inherent in Dr. Julian's proffered testimony.

**D.     Dr. Julian's Diagnosis of Post-Traumatic Stress Disorder Is Generally Unreliable**

Under Rule 702, the Court focuses on the principles and methodology of the expert as well as the conclusions that such principles and methods generate. *Daubert*, 509 U.S. at 595. Diagnosing a mental disorder is a complex matter requiring a thorough understanding of an individual's personal and medical history. Lisa H. Gold & Robert I. Simon, *Post Traumatic Stress Disorder in Employment Cases, in* MENTAL AND EMOTIONAL INJURIES IN EMPLOYMENT LITIGATION 502, 531 (James J. McDonald, Jr. & Francine B. Kulick eds., 2nd ed. 2001). This treatise goes on to note that while there are no formal or official rules for the diagnosis of PTSD in the litigation context, the Georgetown University School of Medicine has established

---

[11] *See, e.g., Shepherd v. American Broadcasting Companies, Inc.*, 862 F. Supp 486, 494 (D.D.C. 1994), vacated on other grounds, 62 F.3d. 1469 (D.C. Cir. 1995) ("Serious threats to life or limb like kidnapping, torture or murder may trigger PTSD. Ugly and inexcusable sexist and racist jokes and insults — although deplorable (and, in this case, actionable and compensable) — generally do not trigger PTSD.").

guidelines based on accepted systems of psychiatric diagnoses and procedures ("Georgetown

Guidelines"). *Id.* at 532. The Georgetown Guidelines state:

(1)     *The diagnosis of PTSD should be based on current DSM criteria.* In general, the forensic examiner should be guided by the official diagnostic manuals, the professional literature, and current research. Idiosyncratic definitions of PTSD should not be used. If the official diagnostic criteria are not used, the burden of proof should be on the forensic   examiner to provide scientific evidence for the diagnosis of PTSD;

(2)     *In assessing the sufficiency of a traumatic stressor for the diagnosis of PTSD, the forensic examiner should be guided by official diagnostic manuals, the professional literature, and current research.* The possible contributions of multiple stressors to the PTSD claimant's clinical picture should be evaluated;

(3)     *A credible forensic psychiatric evaluation of a PTSD claimant requires a thorough   examination of the claimant's psychiatric and medical history, including review of prior medical, psychiatric, and other pertinent records;*

(4)     *Relying solely on subjective reporting of symptoms by PTSD claimants without considering additional sources of information is insufficient.* As a corollary, treater and forensic roles should not be mixed in the forensic examination of a PTSD claimant;

(5)     *Standard assessment methods should be used in evaluating the level of functional   psychiatric impairment of PTSD claimants.* Relying solely on clinical experience or on   strictly subjective or idiosyncratic criteria in assessing psychiatric impairment should be avoided.

*Id.* at 533 (emphasis added).

Dr. Julian's proffered testimony meets none of these criteria. Dr. Julian has not

conducted a forensic evaluation of each plaintiff or reviewed each plaintiff's personal and

psychological history. Group diagnosis based on reading allegations in a letter from counsel and

meeting with the twelve Plaintiffs under these circumstances does not satisfy the standard for a

proper mental health diagnosis. Thus, Dr. Julian has failed to employ the same level of

intellectual rigor that an expert would apply in diagnosing Plaintiffs with PTSD. In fact, Dr.

Julian has not disclosed any method for her diagnosis of PTSD other than her subjective

opinion[12] and to state in her expert report that "a diagnosis of PTSD may be safely assumed." Dr. Julian's opinion is based on pure speculation and not on any recognized scientific methodology. Her testimony that Plaintiffs suffer from PTSD is wholly speculative or conjectural and should be excluded by this Court under Rule 702 as unreliable. *See Boyd v. State Farm Ins. Co.*, 158 F.3d 326, 331 (5th Cir. 1998) (recognizing the "well established" rule that "without more than his credentials and a subjective opinion, an expert's testimony that a medical condition simply 'is so' is not admissible").

## E.    Dr. Julian's Human Resource Opinions Should Be Excluded

In addition to her opinions in the field of clinical psychology, Dr. Julian proposes to offer opinions on other "various aspects of this case." One of these aspects involves "Human Resource Development." (Ex. D, Julian Report at 6.) These opinions involve "best practices in the fields of human management and organizational development." (*Id.*) This proposed testimony should also be excluded.

First, expert testimony about Defendant's alleged deviation from "best practices" in the field of "human resource development" is not germane to any issue in this case. There is no legal obligation — and certainly none incident to the discrimination claims in this case — requiring an employer to maintain any particular level of human resource function. That is a business decision, and as the Fifth Circuit has frequently noted, business decisions are not to be second guessed by the courts in the context of employment discrimination cases. *See Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 959 (5th Cir. 1993); *Bryant v. Compass Group USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) ("Management does not have to make proper decisions, only non-discriminatory ones.")

---

[12] In conducting a *Daubert* analysis, a trial court "must rule out subjective belief or unsupported speculation." *Watkins v. Telsmith*, 121 F.3d 984, 990 (5th Cir. 1997).

Dr. Julian complains loudly that Defendant Shipley, a family business, violated industry standards and best practices in not having an HR department, resident professional, safety and risk management procedures and related functions (Ex. D, Julian Report at 7.) But this case is about allegations of intentional discrimination, not the quality of business practices. *Smith v. Monsanto Chem. Co.*, 770 F.2d 719, 723 (8th Cir. 1985) ("It is an employer's business prerogative to develop as many arbitrary, ridiculous and irrational rules as it sees fit. Our only concern is that the employer must apply its rules in an even-handed, non-discriminatory manner.") Moreover, Defendant Shipley has demonstrated that Plaintiffs' negligent hiring, negligent retention and negligent supervision claims are not a viable part of this case. (*See* Defendant Shipley's Mot. Summ. Judg. at 74-82.)

Thus, the proffered testimony about the quality of human resource practices is not helpful to the finder of fact as required by Federal Rule of Evidence Rule 702. Furthermore, the testimony would be prejudicial due to Dr. Julian's characteristic hyperbole. For example, Dr. Julian testified that it was her contention that Defendant Shipley purposefully did not have a human resource function in order to accomplish some illegitimate end. (Ex. B, Julian Depo. at 140.) Of course, there is no expert basis for such a conclusion. She testified about Mr. Shipley that, "I just know in terms of HR that he's got to be the lousiest manager on the planet." (Ex. B, Julian Depo. at 122.) She states in her report:

> A company such as Shipley that has no training programs, formalized policies, safety and risk-compliance oversight or professional HR leadership is an anomaly in the world of business and ripe for creating an environment where abuse and criminality can flourish.

(Ex. D, Julian Report at 7.)   These characterizations have nothing to do with any cognizable claims in this case.   And it is just as clear that the Court, as part of its *Daubert* gatekeeper responsibilities, has the discretion to exclude this material.[13]

**F.    Dr. Julian's Testimony Should Be Excluded Because The Prejudicial Effect of the Testimony Outweighs Any Probative Value**

Rule 702 requires the proponent of expert opinion testimony to prove that the testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702. As discussed above, Dr. Julian's opinions have no probative value; however, even if they were assumed somehow to be minimally probative, Rule 403 requires that expert opinion testimony, like other forms of evidence, be excluded "if its probative value is substantially outweighed by unfair prejudice, confusion of the issues, or misleading the jury." FED. R. EVID. 403.   The Supreme Court has held that this principle must be applied more expansively in the case of expert testimony:

> Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.   Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.

*Daubert,* 509 U.S. at 595 (citation and quotation omitted).

Dr. Julian's testimony should be excluded because it merely would serve to mislead the jury and because her scientific opinion is unreliable.   She did not employ any of the aforementioned principles and methods used by trained psychiatrists and psychologists in

---

[13] Of similar effect is Dr. Julian's statement (Ex. D, Julian Report at 7) that "Mr. Shipley's habit of wearing guns in the plant generated the impression that he was a figure of oppression and fear rather than remediation and concern." Defendant Shipley has demonstrated (Ex. 69 to Mot. Summ. Judg. at ¶ 24) that Lawrence Shipley carried a firearm because he would arrive at his place of business in a very dangerous neighborhood during hours of darkness. Plaintiffs attempt to use this personal safety precaution to the prejudice of Mr. Shipley; however, they should not be permitted to do so under the guise of expert testimony.

making her diagnosis. Dr. Julian's global diagnosis of PTSD for all the Plaintiffs is speculative and based on nothing more than her subjective opinion. *See Edmonds v. Illinois Central Gulf R. Co.,* 910 F.2d 1284, 1287 (5th Cir. 1990) (excluding an expert's medical diagnosis where the witness was unqualified to make a medical diagnosis and the opinion was fundamentally unsupported). Permitting Dr. Julian to express her opinion before a jury would be severely prejudicial to Shipley because that would imply that her subjective, unsupported testimony is the product of reliable principles and methods. Any jury presented with Dr. Julian's testimony might be misled into accepting her conclusions merely because she is labeled an "expert." Consequently, Dr. Julian's unqualified and unreliable testimony should also be excluded as prejudicial. *See Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987) (noting "[i]f an opinion is fundamentally unsupported, then it offers no expert assistance to the jury . . . [the opinion's] lack of reliable support may render it more prejudicial than probative, making it inadmissible . . ."); *see also Tyger Const. Co. v. Pensacola Const. Co.*, 29 F.3d 137, 144 (4th Cir. 1994) (holding "[w]hen the assumptions made by an expert are not based on fact, the expert's testimony is likely to mislead a jury, and should be excluded by the district court").

## IV. CONCLUSION

For the reasons stated herein, Defendant Shipley Donut Flour & Supply Co., Inc. respectfully requests that the Court exclude the proffered expert testimony of Dr. Shari Julian.

Respectfully submitted,

OF COUNSEL:                                    BAKER BOTTS L.L.P.

Tony Rosenstein
State Bar No. 17279400
Fed. I.D. No. 01877                            By: _____

                                                   Teresa S. Valderrama
BAKER BOTTS L.L.P.                                 State Bar No. 20422500
One Shell Plaza                                    Federal I.D. No. 10687
910 Louisiana                                      One Shell Plaza
Houston, Texas  77002                              910 Louisiana
Telephone:  (713) 229-1234                         Houston, Texas  77002
Facsimile:  (713) 229-1522                         Telephone:  (713) 229-1860
                                                   Facsimile:  (713) 229-1522

                                               COUNSEL FOR SHIPLEY DONUT FLOUR &
                                               SUPPLY CO., INC.


**CERTIFICATE OF SERVICE ACCORDING TO ELECTRONIC FILING PROTOCOLS**

        I hereby certify that on the 17th day of September 2007, this instrument was filed
pursuant to the electronic filing protocols applicable in the United States District Court for the
Southern District of Texas, Houston Division, and that service therefore will be made in
compliance with those protocols.

                                    _____
                                    Teresa Valderrama