# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| FILIBERTO ROBLES ALVARADO, JOEL CASTILLO, FELICIANO CURIEL GIL, OSCAR ESPINOSA, GERARDO GUZMAN, ELEAZAR HERNANDEZ GIL, JOSE ANGEL MALDONADO, MIGUEL ANGEL PAZ, PEDRO PAZ ESTRADA, ISAAC PENA RAMIREZ, WINGER RAMOS and JOEL SIXTOS SALVADOR, | § § § § § § § § § § § | |
| Plaintiffs, | § § | CIVIL ACTION NO. H-06-CV-02113 |
| V. | § § | |
| SHIPLEY DONUT FLOUR & SUPPLY CO., INC. d/b/a SHIPLEY DO-NUTS, | § § § | |
| Defendant. | § | |

## AFFIDAVIT OF RANDALL PRICE, PH.D.

STATE OF TEXAS          §
                        §
COUNTY OF HARRIS        §

BEFORE ME, the undersigned Notary Public, on this day personally appeared Randall Price, Ph.D., who being duly sworn on oath deposed and stated as follows:

1. My name is Randall Price. I am of legal age and otherwise competent to give this affidavit. The facts and assertions contained in this affidavit are within my personal knowledge, and they are true and correct.

2. I have been asked by the Defendant in this case to serve as an expert and have submitted a report in this matter. My qualifications and background are described in detail in an attachment to that report. In summary, I am a clinical psychologist, specializing in forensic psychology. I am licensed as a psychologist at the Ph.D. level in the states of Texas, Oklahoma,

HOU02:1116148.1

and Kentucky. I am also board certified in forensic psychology by the American Board of Professional Psychology; and board certified in neuropsychology by the American Board of Professional Neuropsychology.

3. The primary purpose of this affidavit is to comment on Plaintiffs' submission to the Court concerning the opinions of Dr. Shari Julian, and to discuss several of the subjects adverted to in my previous report. At the time I submitted my report, I expected to be deposed in this matter, as was Plaintiffs' expert, Dr. Shari Julian. As such, it should be noted that this affidavit is not intended to be exhaustive, and it should be read in conjunction with the previously submitted report.

A.  **CONFIRMATION BIAS**

4. I note in my report (p. 7, ¶ 7) that Dr. Julian's methodology suggests the presence of a confirmation bias. The term "confirmation bias" describes the situation in which a clinician or researcher attempts to confirm for themselves a previously held belief or stereotype, rather than to undertake a scientific investigation of whether the conclusion is supported by the data. Confirmation bias is the antithesis of the scientific method, which requires a researcher or clinician to keep an open mind and permit the data to either support or refute the hypothesis under study. The circumstances of Dr. Julian's assessment reflect a quintessential confirmation bias for several reasons.

5. First, Dr. Julian made her diagnosis before ever conducting a clinical assessment. She describes in her deposition a conference call lasting one hour with fifteen employees and their attorneys. This conference call was apparently conducted by a translator since Dr. Julian does not speak Spanish, and the employees do not speak English. At the conclusion of this call, Dr. Julian wrote an opinion in which she stated that a diagnosis of post-traumatic stress disorder (PTSD) could be "safely assumed."

6. The procedure employed by Dr. Julian does not approach what would be required to reach even a preliminary diagnosis, let alone a conclusion that could be "safely assumed." And it was this "conclusion," in my view totally unsupported, that Dr. Julian then confirmed for herself in her final report. As I have mentioned previously and as I will discuss below, Dr. Julian's method of confirmation itself is inconsistent with competent clinical practice; but regardless of and independent of that problem, the conclusion is clearly a case of confirmation bias rather than scientific or clinical reasoning.

7. To attempt a mental status assessment of an individual based upon one or two minutes of conversation, through a translator, in the context of a group conference call is impossible. It is difficult to put into words the extraordinary deficiency of this approach. But to state that a diagnosis of PTSD may be "safely assumed" on the basis of such a procedure is without any rational basis in the science of clinical psychology.

B. **FAILURE TO TAKE A CASE HISTORY**

8. When Dr. Julian finally did meet in person with the Plaintiffs (she says for approximately two hours each), she did not take even a rudimentary case history. It is difficult to envision a competent mental status examination that does not include a detailed life history, and that is certainly true of the assessments in the present case. Please see my report at pp. 4 and 5. There is a wealth of information to be gained by discussing an individual's life and family experiences, stressors, modes of adaptation and behavior, and so forth. In my 24 years of clinical and forensic practice, I cannot recall a single instance of a clinical diagnosis of the kind Dr. Julian proffers being made without the clinician taking a case history.

9. Plaintiffs' attorneys appear to excuse this deficiency by saying that Dr. Julian took a "head history." Please see Plaintiffs' submission at pp. 8-9. Indeed, Dr. Julian's deposition does contain this phrase (at p. 32). There is no such term as "head history" in

psychological science or practice. What is very clear from Dr. Julian's deposition and report is that she did not take any personal or psychological history from any of the individuals she purports to diagnose. That falls far short of acceptable practice in the field of clinical psychology. No competent psychological examiner in a non-judicial setting would undertake a mental status examination of the type Dr. Julian purports to have done without taking a careful history.

10. Of significance to me is that Dr. Julian's reason for not taking this essential step is her assertion that it was required only in clinical settings and not when making a diagnosis for the Court. I have noted my disagreement with this in my report (at pp. 6-7).

11. Another rationalization by Dr. Julian (please see her deposition at 63, and my report at p. 4) is that the "eggshell skull" theory somehow justifies a diagnostician not doing a case history. I do not understand Dr. Julian's rationalization; it does not comport with practice in my field. Either these twelve individuals are suffering from post-traumatic stress disorder, or they are not; to make that determination, it is necessary (among other things) to explore with them their life experiences and history to understand their response to the stressors alleged to have occurred in this case. The term "eggshell skull" whatever it may mean for a judge, does not have a technical meaning for a clinical psychologist.[1] Clinical psychology generally — and the DSM-IV in particular — does not provide for a different set of diagnostic criteria or methodology based upon an examiner's subjective views.

---

[1] To the extent that Dr. Julian may be implying that all twelve of these individuals are particularly susceptible to PTSD, there is absolutely nothing in the data to support such an assertion. Indeed, from what little we know, one might speculate that these persons were somewhat more inured to life's travails than the "average" person (whatever that is). That is, these individuals seem to have dealt with difficult backgrounds and exercised the considerable initiative required to leave their native country, and so one would not assume a greater vulnerability to subsequent stressors. Note that I do not rely upon this factor for my opinions; it is speculative. I merely point out that Dr. Julian's apparent implication to the contrary is without support.

HOU02:1116148.1    4

### C. CAN DR. JULIAN'S METHODS BE TESTED?

12. The procedures employed by Dr. Julian are not subject to verification. The testing of hypotheses and conclusions is an integral part of the scientific method. Dr. Julian could have and should have utilized psychometric measures in making her diagnoses. I have detailed a number of these in my report (¶ 1, p. 5). For example, the MMPI is available in Spanish; it has been subject to voluminous research and refinement; it has validity scales to assist the clinician who is evaluating the reliability of a particular test result; and there are subscales specifically designed to assess the presence or absence of PTSD. This includes a subscale of the MMPI formulated by Dr. Terrence Keane. Dr. Julian produced a set of slides authored by Dr. Keane (Exhibit 10 to her deposition) which she apparently obtained from an Internet website. Dr. Keane is certainly a recognized authority on PTSD, and Dr. Julian's referencing his work reinforces the problem because Dr. Julian's methodology and approach violate principles of reliable diagnosis authored by Dr. Keane.

13. Dr. Julian's attorneys imply (*see* their submission at p. 8) that "cultural" issues are responsible for the lack of psychometric testing. However, as noted in my report (at p. 6), a number of the well regarded psychometric instruments are available in Spanish. Further, to the extent that Dr. Julian's attorneys are implying a reading level issue, the way that would be handled by a clinician would be to assess reading level independently, which can very easily be done. It is evident that Dr. Julian did not do this; rather she simply did not consider utilizing standard and helpful psychometric instruments.

14. Another aspect that renders Dr. Julian's procedure not subject to adequate testing and verification is the manner in which she went about gathering information from the twelve individuals she was purporting to study. Dr. Julian's notes (produced at her deposition) are exceedingly sparse and do not themselves support a diagnosis of PTSD. More importantly,

however, it is impossible to conduct an independent review of these interactions because Dr. Julian made no record of the questions she asked and virtually no record of substance of the answers she obtained. This is in direct contradiction to Dr. Julian's assertion that she used a "structured interview" approach. As noted in my report (pp. 5-6), Dr. Julian did not employ a procedure that could qualify as a structured interview as that term is used in psychological science.

15. Dr. Julian stated that she did not use psychometric tests (and implied that she did not use one of the available structured interview instruments) because she was engaged in forensic rather than clinical work.[2] I do not agree with this reasoning, and it is at odds with generally accepted principles of both forensic and clinical psychology. In both applications, it is essential that the diagnostician, clinician or researcher adhere to principles of scientific discipline. That one is engaged in forensic assessment is not a reason to employ more subjective or less disciplined means of analysis. While the outcomes of clinical and forensic work may be different, both fields require reliability and scientific discipline. The rate of potential error in diagnosing PTSD is going to be problematic even under the best of circumstances, as demonstrated in one or more of the articles cited in my report. Dr. Julian's methodology and approach can only exacerbate this problem.

## D. FAILURE TO CONSIDER CONTRA-INDICATIONS

16. There are significant features of the way these twelve individuals presented, which Dr. Julian either ignored or failed to deal with, and which are contra-indicative of PTSD. For example, Dr. Julian states that she does not know which of the Plaintiffs chose to remain with

---

[2] Dr. Julian's attorneys appear to rely on "FAQs About PTSD Assessment" (*see* their submission at p. 7). It is not clear that Dr. Julian actually relied on the FAQs ("Frequently Asked Questions"), because they are not referenced in her report nor discussed in any of her deposition answers. Rather, the FAQs are merely some of the materials Dr. Julian brought with her to show what she called the "flavor" of her opinions. Also produced as part of these materials (Exhibit 9 to the deposition) is an article on "America's Slave Labor" and an article entitled "The New Slave Trade," also not referenced in any direct way by Dr. Julian. In any event, the FAQs, while noncontroversial in themselves, do not support Dr. Julian's methodology in this matter.

Shipley and that this is not a subject that concerns her. However, avoidance behavior (or the absence of same) is an important aspect of PTSD.

17. It is to be expected in most, if not all, cases of PTSD that the subject will seek to avoid stimuli that serve to remind him or her of the event giving rise to the condition. It is not uncommon for individuals with PTSD to go to extraordinary lengths (to the extent of what psychologists would label maladaptive behaviors) in this regard, and it would be at least unusual for such a person to exhibit no avoidance behavior at all.

18. It is my understanding that many of the Plaintiffs remained at Shipley. If one were to entertain a diagnosis of PTSD for these persons (as Dr. Julian does), it would be essential to explore in detail why they are not exhibiting the avoidance behavior characteristic of the disorder. Yet Dr. Julian did not even trouble to find out about this. While it might be possible to explain an absence of avoidance behavior in some cases, Dr. Julian makes no effort to do so, and her assertion that this fact is inconsequential is impossible to reconcile with standard psychological theory.

19. Dr. Julian should also have been skeptical that twelve out of twelve individuals exposed to any traumatic event would develop PTSD. As explained in my report (at ¶ 8), the probability of this occurrence is smaller than any fraction commonly used to describe unlikely events. And this *a priori* unlikelihood would be true if all twelve individuals had been exposed to an indisputably extreme trauma of the type described in the DMS-IV as being required to even potentially result in PTSD. In contrast, here we have twelve individuals who may have been exposed, at most, to events that most clinicians would view as borderline or, more likely, insufficient precursors to PTSD.

20. I have encountered many individuals (both in clinical and forensic work) who have been exposed to trauma far more intense and severe than that described for these twelve

persons, who have not developed a resulting PTSD. And to contend, based upon the data available to Dr. Julian, that all twelve share this disorder is analytically insupportable.

21. All of these factors should have made Dr. Julian skeptical and been the subject of further and detailed inquiry. Instead, she was apparently willing to assume the presence of an extraordinarily unlikely condition without doing any scientific investigation.

22. It is possible to describe (at least approximately) the scientific process of rendering a psychological diagnosis under these circumstances as consisting of a number of steps. Without attempting to be exhaustive here, these might include (1) data gathering; (2) hypothesis testing; (3) application of DSM-IV criteria and related clinical principles; (4) accounting for or explaining inconsistencies in presenting symptoms or other data; and (5) general process checks and reliability.

23. In terms of these steps in the process, Dr. Julian's methodology was defective at each and every stage. She did not engage in the kind of data gathering necessary to support a diagnosis of PTSD (*see* ¶¶ 5, 6, 8, 9, 12-15, above). She did not engage in hypothesis testing in any scientific manner, because she was reasoning toward a predetermined result which I have described above as confirmation bias. She did not correctly apply the DSM-IV. She did not account for or explain various contra-indications of PTSD, *e.g.*, by conducting any investigation of the lack of avoidance behavior. Finally, Dr. Julian's conclusions fail several process checks including a basic consideration of whether her general conclusion makes sense in light of applicable occurrence frequencies for PTSD, and particularly as viewed in the context of the type, degree and circumstances of the stressors alleged to have occurred.

24. I have read Defendant's Motion to Exclude Expert Testimony of Shari Julian, and Defendant's reply in support of that motion. I cannot comment on the legal arguments in either of these documents, of course; however, I can and do state that the assertions about

principles and methods of the science of clinical psychology contained in the motion and reply are accurate.

Further affiant sayeth not.

_____
Randall Price, Ph.D.

Sworn to and subscribed before me on this 17th day of October 2007.

_____
Notary Public in and for the
State of Texas