IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| FILIBERTO ROBLES ALVARADO, *et al.*, § | | |
| Plaintiffs, § | | |
| § | | |
| v. § | | CIVIL ACTION NO. H-06-2113 |
| § | | |
| SHIPLEY DONUT FLOUR & § | | |
| SUPPLY CO., INC., d/b/a SHIPLEY § | | |
| DO-NUTS, § | | |
| Defendant. § | | |

**MEMORANDUM AND ORDER**

In this employment discrimination case, Defendant Shipley Donut Flour & Supply Co., Inc., d/b/a/ Shipley Do-Nuts ("Shipley") has filed a Motion to Exclude Expert Testimony of Dr. Shari Julian [Doc. # 92] ("Motion"). Plaintiffs have responded [Doc. # 99], and Defendant has replied [Doc. # 100]. Having considered the parties' submissions, the applicable legal authorities, and all matters of record, the Court concludes that Defendant's motion should be **GRANTED**.

**I.    FACTUAL BACKGROUND**

Plaintiffs have designated Shari Julian, Ph.D., as an expert to testify about Plaintiffs' alleged psychological injuries resulting from treatment during their employment with Defendant. Dr. Julian has concluded that all twelve Plaintiffs suffer from PTSD. Final Report of Shari Julian, Ph.D., dated June 18, 2007 (Exhibit D to Motion) ("Julian Report"); Deposition of Shari Julian, Ph.D. (Exhibit B to Motion) ("Julian Deposition"), at 29. The Julian Report gives a short paragraph on each Plaintiff, introduced as an "overview of some of the causality and the trauma based outcomes for each of the Plaintiffs," which provides only descriptions of symptoms, such as depression, tension in the

neck, feelings of guilt, and marital problems. Julian Report, at 10-12.

Plaintiffs also proffer Dr. Julian as an expert on Human Resource Development, which involves "best practices in the fields of human management and organizational development." Julian Report, at 6. Dr. Julian states that,

> A company such as Shipley that has no training programs, formalized policies, safety and risk-compliance oversight or professional HR leadership is an anomaly in the world of business and ripe for creating an environment where abuse and criminality can flourish.

*Id.* at 7.

Defendant challenges Dr. Julian's methodology in arriving at her PTSD diagnoses for Plaintiffs. Plaintiffs state that her diagnoses were based on the following: reviewing case-related documents, including deposition transcripts; conducting a group phone interview, through a translator, with fifteen[1] Plaintiffs collectively; and eventually meeting with each Plaintiff individually for at least two hours.

After the group interview with all fifteen Plaintiffs, Dr. Julian produced a preliminary report concluding that a PTSD diagnosis could be "safely assumed" for all Plaintiffs. Preliminary Report of Shari Julian, Ph.D., dated February 28, 2007 (Exhibit C to Motion), at 4. The group interview, conducted over the phone and through a translator, lasted approximately one hour. Julian Deposition, at 44-45. Defendant asserts that this procedure allowed Dr. Julian to focus on each Plaintiff only for a very short time, approximately two minutes. Plaintiffs refer to Dr. Julian's individual meetings with Plaintiffs as "structured interviews." Response, at 6.

Defendant retained J. Randall Price, Ph.D., to review Dr. Julian's methodology and forensic

---

[1] At the time Dr. Julian conducted this interview, there were fifteen plaintiffs in the case.

conclusions. On the basis of Dr. Price's report and affidavit, Defendant strenuously challenges Dr. Julian's methodology. Defendant points out that Dr. Julian in fact did not follow the necessary steps for the recognized psychological diagnostic procedure encompassed by "structured interview" protocols, did not administer any psychometric tests, did not record questions and answers, and did not take crucial clinical or life histories of Plaintiffs.

Dr. Price, with citations to recognized psychological authorities, concludes that "Dr. Julian's evaluation methods do not provide a clear or trustworthy foundation to support her conclusions," and that her conclusions "are overly subjective and not based on scientific or generally accepted forensic methods." Report of J. Randall Price, Ph.D., dated July 9, 2007 (Exhibit A to Motion) ("Price Report"), at 3.

## II.   LEGAL STANDARDS

The Federal Rules of Evidence state that "a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." FED. R. EVID. 702.

These Rules require that the Court ensure that all expert testimony or evidence is both (1) relevant and (2) reliable. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589 (1993).[2]

> This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid [*i.e.*, the reliability factor] and of whether that reasoning or methodology properly can be applied to the facts in issue [*i.e.*, the relevance factor].

---

[2]   The *Daubert* standard applies to all expert testimony, not just scientific testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

*Id*. at 592-93.

*Daubert* lists five nonexclusive factors that a trial court may consider when determining an expert's reliability: (1) whether the theory or technique can be and has been subjected to testing; (2) whether it has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether it has attained general acceptance. *Hathaway v. Bazany*, 507 F.3d 312 (5th Cir. 2007) (citing *Daubert*, 509 U.S. at 593–94); *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997) (citing same). This analysis, however, is a flexible one. "[N]ot every *Daubert* factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant." *Guy v. Crown Equip. Corp*, 394 F.3d 320, 325 (5th Cir. 2004) (citing *Kumho Tire*, 526 U.S. at 151).

The district court's responsibility "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152; *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002).

The burden is on the party offering the expert testimony to establish by a preponderance of the evidence that it is admissible. *Bocanegra v. Vicmar Servs., Inc*., 320 F.3d 581, 585 (5th Cir.), *cert. denied*, 540 U.S. 825 (2003); *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc), *cert. denied*, 526 U.S. 1064 (1999). The party offering the challenged expert opinions need not, however, prove that the testimony is "correct." *Moore*, 151 F.3d at 276. A showing of reliability requires "objective, independent validation of the expert's methodology." *Id*. "The expert's assurances that he has utilized generally accepted scientific methodology is insufficient." *Id*.; *see General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("nothing in either *Daubert* or the Federal

Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert").

### III.  ANALYSIS

Plaintiffs proffer Dr. Julian as an expert on two subjects: Plaintiffs' alleged psychological injuries and human resources practices in business settings.[3]

#### A.  PTSD Diagnoses of Plaintiffs

Defendant's Motion challenges the reliability of Dr. Julian's opinion regarding Plaintiffs' psychological injuries under *Daubert*,[4] urging that Plaintiffs fail to meet the standard *Daubert* reliability factors. Notably, Plaintiffs do not support Dr. Julian's methodology with citation to recognized authorities or even make meaningful argument with specific reference to these *Daubert* factors.

#### 1.  Standards Controlling the Technique's Operation

Defendant argues that Dr. Julian failed to use scientifically sound techniques with appropriate controls to diagnose Plaintiffs' conditions and reach the conclusion that each Plaintiff suffered from PTSD. In particular, Defendant contends that Dr. Julian failed to use accepted psychological measurement tools or tests. As Plaintiffs explain it, Dr. Julian arrived at her PTSD diagnoses for

---

[3] The expert's qualifications are a threshold matter under Rule 702. FED. R. EVID. 702 ("a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto . . ."). Both sides have briefed Dr. Julian's qualifications. Despite certain serious reservations, the Court will assume, without deciding, that Dr. Julian is qualified to testify to the opinions she offers in this case.

[4] Defendant does not challenge the relevance of Dr. Julian's PTSD diagnoses. The probative value of expert psychiatric or psychological proof regarding the cause of a plaintiff's emotional distress is well-recognized. *See Skidmore v. Precision Printing and Packaging, Inc.*, 188 F.3d 606, 617–18 (5th Cir. 1999) (affirming lower court's admission of expert's PTSD diagnosis as evidence of emotional distress).

them "after reviewing each of their depositions, interviewing them telephonically, and interviewing them face-to-face." Response, at 7. Plaintiffs do not join issue with Defendant's expert, Dr. Price, who explained the recognized diagnostic approaches for PTSD as follows:

> The generally accepted method for the evaluation of PTSD is one that includes scientifically based psychological tests that include psychometric data or error rates. For example, Keane[5] recommends the use of multiple sources in the assessment of PTSD in litigation contexts, including taking a comprehensive history, a structured clinical interview, the use of general personality tests, the administration of specific tests that measure PTSD and its associated clinical features. The use of general personality tests such as the MMPI-2 [are useful in measuring PTSD.] . . . . Other similar tests that objectively substantiate PTSD symptoms include the Million Multiaxial Personality Inventory-Third Edition (MCMI-III) and the Personality Assessment Inventory. Both the MMPI-2 and the MCMI-III are available in Spanish.
>
> More than 20 standardized PTSD measures have been peer-reviewed and are generally accepted in the scientific community. Several of these instruments are appropriate for possible use in an evaluation such as the one Dr. Julian conducted including: (1) Revised Civilian Mississippi Scale; (2) Trauma Stress Schedule; (3) Trauma Symptom Inventory; (4) Detailed Assessment of Posttraumatic Stress; (5) Posttraumatic Stress Diagnostic Scale. The Revised Civilian Mississippi Scale and the Trauma Stress Schedule are of particular usefulness in this matter since equivalent Spanish language version have been developed for these instruments.

Price Report, at 5, ¶ 1 (footnotes omitted).

Plaintiffs concede that Dr. Julian diagnosed their PTSD without use of formal psychological tests but argue that "PTSD may be diagnosed through a number of [methodologies]."[6] They urge that, even if some of the tests Defendant advocates would have "assisted" Dr. Julian, she essentially

---

[5] Dr. Price apparently is referring to Dr. Terence Keane, whom the parties agree is a leading authority on PTSD. Julian Deposition, at 62, 144-45.

[6] Response, at 7. In support, Plaintiffs cite a document entitled "FAQs about PTSD Assessment: For Professional" but do not attach a copy. Thus, the Court does not credit this reference or place any weight on it. Apparently the FAQs were an exhibit to Dr. Julian's deposition. The Court has located on the Internet a copy of a document bearing the same name as that cited by Plaintiffs (*see* http://www.ncptsd.va.gov/ncmain/ncdocs/fact_shts/fs_prof_faqs_assessment.html?opm=1&rr=rr1 366&srt=d&echorr=true) but declines to rely on it as the parties did not provide it or a citation to it.

used the technique known as "structured interview." Response, at 8. Plaintiffs' arguments are unavailing. Plaintiffs have the burden to show their expert reached her conclusions based on reliable methods. *Bocanegra*, 320 F.3d at 585; *Moore*, 151 F.3d at 276. They have failed to do so.

Dr. Julian characterized her method as a "structured interview" with flexibility.[7] She agreed that there are published instruments called structured interviews, and that some are specifically directed to the assessment of PTSD, but stated that she did not use any of those instruments "because there wasn't [sic] any that was as appropriate as my own experience and knowledge." Julian Deposition, at 36-37, 39. Instead of using a consistent, formalized, printed interview format standard in the field, Dr. Julian worked from her memory, relying on her personal experience. She stated:

> In the structured interview that I use, I use the questions that would appear as structured; I just kind of make them specific to situations. So, you know, I editorialize them; I flavor them up a little bit for each specific situation, change the language around to make it—the difference between, let's say, a more sophisticated viewer than a viewer that I might have to be a lot more black-and-white and subject/verb/object with.
>
> So I just want to be clear: I don't pull these out of the air. I use the ones that are considered appropriate questions in the discipline.

Julian Deposition., at 40. She thus did not use any of the recognized structured interview

---

[7]   Julian Deposition, at 31 ("The very best thing, when you have a lot of experience like I do, 22 years—no, more than that, 23 years of doing this—is to use the structured interview to gather data and kind of get a sense, because we need a chance to be flexible and to listen.") Dr. Price presents a more authoritative definition of the structured interview:

> The purpose of a structured clinical interview is to provide standardization and objective questioning. Weiss (1997) describes a structured clinical interview as 'a formalized interview process or procedure that has internally logical or consistent rules that govern the content of questions asked of an interviewee, the order in which the topics are covered, and the specific kind of information sought.

Price Report, at 6 (citing Weiss 1997).

instruments. *Id*. at 40-41.[8] Further, she has no record of the questions that she asked. *Id.*[9]

Dr. Julian also asserted that a full clinical history was not required or appropriate in diagnosing Plaintiffs. Julian Deposition, at 62-63. She stated that she did a "head history" on Plaintiffs and then "checked the DSM-IV," that she had done everything necessary to reach her diagnoses, and that she had tried to avoid "unnecessary" testing. Julian Deposition, at 31-32.[10] Neither Plaintiffs nor Dr. Julian define the term "head history." Nor do they address the dictates of logic or Dr. Price's criticism that an individualized personal history of a subject is crucial to a conclusion that PTSD was caused by particular events.[11]

Plaintiffs thus rely entirely on Dr. Julian's personal opinions for the PTSD diagnoses, unsupported by any authoritative references or teachings.[12] In other words, Plaintiffs want the Court

---

[8] Dr. Julian testified, "[N]o, I didn't use a printed checklist instrument. I used the questions that would appear most commonly, and then I just kind of flavored them up a little so I had them simple for them." Julian Deposition, at 40-41. She agreed with defense counsel's statement that she conducted the interviews "mostly from memory of having seen a number of instruments." *Id*.

[9] Plaintiffs argue also that Dr. Julian's used of the structured interview technique was appropriate because of the "linguistic and cultural challenges the [P]laintiffs present," and because many psychological tests are available only in English. Response, at 8 (citing Julian Deposition, at 30). The issue is whether in fact she properly performed structured interviews at all.

[10] Julian Deposition, at 31 ("[M]ost of all, in doing a report for the court where you don't want to—you don't want to do a lot of unnecessary testing. You don't want to, you know, use tests that may or may not be helpful.").

[11] *Cf.* Price Affidavit at 3-4, ¶¶ 8-9 ("It is difficult to envision a competent mental status examination that does not include a detailed life history, and that is certainly true of the assessments in the present case. . . . In my 24 years of clinical and forensic practice, I cannot recall a single instance of a clinical diagnosis of the kind Dr. Julian proffers being made without the clinician taking a case history. . . . Plaintiffs' attorneys appear to excuse this deficiency by saying that Dr. Julian took a 'head history.' . . . . There is no such term as 'head history' in psychological science or practice.")

[12] Plaintiffs also rely on the FAQs which, as noted earlier, are not in the record. Plaintiffs cite the FAQs to support their arguments that there is no "best" PTSD measure, that the assessor has discretion to determine the most appropriate methodology for assessment of each patient, and that the structured
(continued...)

to simply accept Dr. Julian's opinion because she says it is true. This is precisely the type of highly subjective, *ipse dixit*-type expert opinion testimony that *Daubert* and its progeny forbid. *See Joiner*, 522 U.S. at 146 ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert"); *Boyd v. State Farm. Ins. Co*., 158 F.3d 326, 331 (5th Cir. 1998), *cert. denied*, 526 U.S. 1051 (1999) (citing "well established" rule that "without more than his credentials and a subjective opinion, an expert's testimony that a medical condition simply 'is so' is not admissible"); *Moore*, 151 F.3d at 276 ("showing of reliability requires "objective, independent validation of the expert's methodology").[13] Plaintiffs have fallen woefully short in their efforts to demonstrate that Dr. Julian used a diagnostic method with appropriate controls to measure the application of the technique employed.

### 2. Theory or Procedures that Can Be and Have Been Tested

As noted above, Dr. Julian performed no psychometric testing, nor any other procedure that can be independently reviewed. While claiming superficially to have relied on the "structured interview" protocol, she conceded that she did not use any published instrument and kept no records of the questions she asked; instead, she merely worked from memory. Julian Deposition, at 40-41.

If Dr. Julian had used a published instrument for her structured interviews, an independent examiner could compare Plaintiffs' responses to those of persons known to be suffering from PTSD,

---

[12]   (...continued)
interview is recognized as an appropriate method for diagnosis of PTSD. Response, at 7-8. As Dr. Price states, "[t]he FAQs, while noncontroversial in themselves, do not support Dr. Julian's methodology in this matter." Price Affidavit, at 6 n.2. As noted above, Dr. Julian did not perform a proper structured interview.

[13]   The fact that Dr. Julian may have had 23 years of experience does not substitute for the necessity of performing clinically sound and regularized procedures to reach scientifically defensible conclusions.

and could review the questions to determine what they covered and whether they were appropriately phrased. *See* Price Report, at 6, ¶¶ 2-3. The absence of independently verifiable procedures undermines Dr. Julian's conclusions. *Daubert*, 509 U.S. at 593 ("The criterion of the scientific status of a theory is its . . . testability") (internal citation, quotation marks, and alteration omitted). Thus, Plaintiffs stumble on this *Daubert* factor as well.

### 3.     General Acceptance Within the Scientific Community

In addition to the scientific deficiencies noted above, Dr. Julian repeatedly differentiated her PTSD diagnostic work in clinical settings from that performed here—in a forensic setting. She explained that, because her PTSD diagnoses of Plaintiffs were not made for clinical purposes, she did not need to use recognized clinical procedures such as psychometric tests or thorough case histories. This approach flagrantly contravenes the basic requirement articulated in *Daubert* by the Supreme Court, requires that a testifying expert "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in a relevant field." *Kumho Tire*, 526 U.S. at 152.

She similarly disclaimed any need for a complete clinical history in the forensic context, even as she affirmed the tool's value in a clinical setting.[14] By her own admission, Dr. Julian focused not

---

[14]     Dr. Julian testified:

> Q.     [D]o you consider it important, in rendering a psychological or mental health diagnosis, to take a complete history, a clinical history, of the—of the subject?
>
> A.     A clinical history? You mean starting back in childhood? No, that's not appropriate. That's not appropriate in a situation like this.
>
> Q.     And why not?
>
> A.     Because, again, I'm not doing interventions; I don't have a clinical outcome. These people—I'm not answering a clinical question for the court. I mean,

(continued...)

10

on appropriate clinical practice and standards, but rather used an approach she devised to support Plaintiffs' legal claims. Apparently in defense of her methodology, Dr. Julian stated that "in doing a report for the court . . . you don't want to do a lot of unnecessary testing." Julian Deposition, at 31.[15]

---

[14] (...continued)
there would be situations where this would be important to know.

But in the matter—in this particular matter, work-related trauma or trauma that they're alleging is related to work, this is not really—this would be a very good way to sort of overbill lawyers, and I'm really against overbilling lawyers.

Q. . . . . But my question to you is this: Is it important in most diagnostic or assessment situations to take a thorough clinical history, yes or no?

A. No, I would say not in situations like this.

Q. And you certainly didn't do it in this case?

A. I went from—my understanding of it is Texas is an eggshell skull case. You take people as you find them when you hire them. And I don't need to know if they loved their mother or father.

I need to know, how was the job situation, what are the—what occurred on the job, and how have you—and now how are you? How were you before this and how are you now, and how has it—has it changed?

Q. Now, whether Texas is an eggshell skull state or not has no bearing on what is appropriate clinical practice, does it?

A. Again, we—we keep confusing clinical practice with what I do.

Julian Deposition, at 62-63.

[15] Dr. Julian elaborated in response to defense counsel's question:

Q. [I]t is important when you're diagnosing an individual to do—to get all the data that is necessary to reach a diagnosis in which you can have some degree of reliability and confidence, correct?

(continued...)

Furthermore, Dr. Julian blinded herself to the absence in Plaintiffs of two key features of the condition of PTSD—extreme trauma and persistent avoidance behavior. The Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR")[16] lists "diagnostic features" for PTSD, which include the following:

> The essential feature of Posttraumatic Stress Disorder is the development of characteristic symptoms following exposure to an extreme traumatic stressor involving direct personal experience of an event that involves actual or threatened death or serious injury, or other threat to one's physical integrity . . . (Criterion A1). . . . . The characteristic symptoms resulting from the exposure to the extreme trauma include . . . persistent avoidance of stimuli associated with the trauma and numbing of general responsiveness (Criterion C). . .

DSM-IV-TR, Section 309.81, Posttraumatic Stress Disorder (Exhibit H to Motion).[17]

Regarding Criterion A1, exposure to an "extreme traumatic stressor," Dr. Julian confirmed the common wisdom that the trauma triggering PTSD must be "an event so terrifying, so threatening, that it made one fear for one's life or one's personal safety," and agreed that examples given by the

---

[15] (...continued)
   A. If you're doing a clinical diagnosis or clinical intervention, that becomes very important. If you're doing a diagnosis in the sense—and that's why I've been very careful to parse my terms away from psychological to—to mental health.

   If I'm trying systematically to find out what's going on and how something has impacted something, it's not as necessary to do the kind of clinical diagnosis that I would do if I was recommending—for me to do further intervention modalities. That's not my role for the courts.

   Julian Deposition, at 31-32.

[16] DSM-IV-TR refers to the revised text version of the Diagnostic and Statistical Manual's fourth edition. Dr. Julian testified at her deposition that the DSM-IV-TR is the "bible" in her field. Julian Deposition, at 14.

[17] Exhibit H is an excerpt from the DSM-IV-TR that defines PTSD. The excerpt was introduced as Exhibit 7 at Dr. Julian's deposition, and Dr. Julian testified that she relied upon this treatise in making her diagnosis. Julian Deposition, at 70, 78.

DSM-IV-TR include being kidnapped, being taken hostage, being tortured, and being placed in a concentration camp.[18]  Plaintiffs and Dr. Julian do not specifically attempt to address the weaknesses in their evidence of any "extreme traumatic stressor," let alone explain the extraordinarily remote chance that all twelve Plaintiffs would develop PTSD from the workplace circumstances presented in this case.  *See* Price Affidavit, at 7-8, ¶¶ 19-20 (concluding that the events in issue are borderline as causes of PTSD and that, based on the data available to Dr. Julian, it is analytically unsupportable that all twelve Plaintiffs would share this disorder); ***see generally*** Memorandum and Order dated November 30, 2007 [Doc. # 108].

Dr. Julian also failed to meaningfully consider the absence of PTSD Criterion C, *i.e.*, persistent avoidance behavior.  When confronted at her deposition with the fact that many Plaintiffs apparently remained in Defendant's employment, or referred their loved ones for employment there, Dr. Julian testified that these facts were not important to her diagnosis of Plaintiffs.[19]  *Cf.* Price Affidavit, at 7, ¶ 18 (Dr. Julian's "assertion that [Plaintiffs' absence of avoidance behavior] is inconsequential is impossible to reconcile with standard psychological theory").

The Court concludes that Dr. Julian did not meaningfully use scientifically based test data or other methods that reflect generally accepted procedures for forensic evaluations.  *See* Price Report, at 3.  *Kumho* condemns this half-baked approach.  Indeed, appellate authorities uniformly condemn an expert ignoring generally accepted clinical standards simply for forensic purposes.  *See, e.g.,*

---

[18]   Julian Deposition, at 72-73.

[19]   When asked, "Did it matter to you in your assessment of these individuals whether they were still employed at Shipley or not?," Dr. Julian answered, "To be honest with you, not—not terribly much." Julian Deposition, at 123-24.  She further testified that "[t]here's nothing bizarre" about "someone who has had a terrible trauma resulting in PTSD referring friends or loved ones to that same aversive situation." *Id*. at 126.

*Pipitone*, 288 F.3d at 244.

### 4. High Known or Potential Rate of Error

Defendant has presented evidence of clinicians' propensity to misdiagnose PTSD in forensic settings.[20] Dr. Price opines, with citation to a recognized treatise, that the average conditional risk of PTSD ranges from 9.2% to 20.9%.[21] Dr. Julian's PTSD diagnoses for 100% of the original fifteen Plaintiffs is "extremely difficult to reconcile with generally accepted, peer-reviewed scientific studies that have demonstrated that the majority of survivors of documented trauma do ***not*** develop PTSD." Price Report, at 8, ¶ 8.

Plaintiffs have presented absolutely no defense of Dr. Julian's 100% PTSD diagnosis rate. Based on the documented and uncontroverted propensity of clinicians to misdiagnose PTSD in connection with litigation, this *Daubert* factor weighs heavily against a finding of reliability as to Dr. Julian's conclusions.

### 5. Conclusion Regarding PTSD Diagnoses

The Court is unpersuaded that Dr. Julian's testimony will assist the jury in rendering an informed verdict. Plaintiffs have failed to meet their burden under *Daubert* to demonstrate that their expert's conclusions that they each suffer from PTSD are reliable and reached after utilization of

---

[20] Price Report, at 8, ¶ 8 (citing Gerald M. Rosen, *The Aleutian Enterprise Sinking and Posttraumatic Stress Disorder: Misdiagnosis in Clinical and Forensic Settings*, 26 PROFESSIONAL PSYCHOLOGY: RESEARCH AND PRACTICE 82-87 (1995) (Exhibit G to Motion) (examining "the vulnerability of clinicians to over-diagnose posttraumatic stress disorder (PTSD) when survivors of a traumatic event are involved in litigation").

[21] Price Report, at 8, ¶ 8 (citing Naomi Breslau, Ph.D., *et al.*, *Trauma and Posttraumatic Stress Disorder in the Community*, 55 ARCHIVES OF GENERAL PSYCHIATRY 626-43 (1998)) (available at http://archpsyc.ama-assn.org/cgi/content/full/55/7/626) (conditional risk of PTSD following exposure to trauma was 9.2%; highest risk of PTSD was associated with assaultive violence (20.9%))

clinical methodologies that comport with recognized psychological diagnostic standards.[22] Dr. Julian may not testify at trial about her PTSD diagnoses of Plaintiffs.

### B. Dr. Julian's Opinions on Human Resources Practices

Plaintiffs originally also proffered Dr. Julian as an expert on human resources practices in business settings. Her expert opinions on this issue are no longer relevant and thus do not meet Rule 702 requirements or *Daubert* standards for admissibility at trial. *See Daubert*, 509 U.S. at 592-93. Plaintiffs have abandoned their claims of negligence; gross negligence, and negligent hiring, supervision, retention, and training. *See* Memorandum and Order [Doc. # 108], at 8 n.4. Plaintiffs implicitly acknowledge their abandonment of these claims as the Response does not address Dr. Julian's human resources opinion testimony. Those opinions are therefore excluded as irrelevant.

### IV. CONCLUSION

For the foregoing reasons, it is therefore

**ORDERED** that Defendant's Motion to Exclude Expert Testimony of Dr. Shari Julian [Doc. # 92] is **GRANTED**.

SIGNED at Houston, Texas, this **18th** day of **December, 2007**.

Nancy F. Atlas
United States District Judge

---

[22]  Indeed, there is no indication that Dr. Julian engaged in any differential diagnosis techniques or independent, unbiased analysis of Plaintiffs' conditions.